**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No:12-cv-1048-JLK

JOSÉ LOZOYA;
ANTONIO MALDONADO; and
MARIO PEÑA, on behalf of
themselves, individually, and on behalf
of those similarly situated,

      Plaintiffs,

      v.

ALLPHASE LANDSCAPE CONSTRUCTION, INC., a Colorado corporation,
doing business as ALL PHASE LANDSCAPE;
DONALD TROY TINBERG;
MARK FISHER; and
LYLE FAIR, in their individual and corporate capacities,

      Defendants.

---

ORDER ON MOTION TO DECERTIFY, DOC. 68

---

Kane, J.

Before me is Defendant's Motion to Decertify, Doc. 68. To decide this motion, I apply a stricter standard than that used to conditionally certify a class for this action, *see* Order On Class Conditional Certification, Doc. 36, and consider (1) the disparate factual and employment settings of individual plaintiffs; (2) various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001).[1] With respect to the first factor, I find that though there are some factual differences among the individual plaintiffs, these differences pale compared to the similarities.

---

[1] There are four *Thiessen* factors. The fourth factor, inapplicable to this case, is whether the employees made the filings required by the ADEA before instituting suit.

1

Considering the second two factors, I find that the defenses available to Defendants do not meaningfully vary or vary only slightly among the individual plaintiffs and that the fairness and procedural considerations favor collective treatment.  Accordingly, I DENY Defendant's Motion to Decertify, Doc. 48.

## I.     INTRODUCTION

The named plaintiffs, José Lozoya, Antonio Maldonado and Mario Peña, were hourly landscape employees for All Phase Landscape Construction, Inc., a Colorado corporation with its headquarters in Aurora, Colorado ("All Phase"). Every plaintiff worked in All Phase's Maintenance Division performing landscape maintenance work in the warmer months, and snow removal work in the colder months.  The plaintiffs' collective action claims are for unpaid overtime and minimum wage under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and supplemental class action claims for unpaid straight time and overtime under Colorado wage and hour law, including the Colorado Wage Act, C.R.S. § 8-4-101, et seq., and Colorado Minimum Wage Order No. 28, 7 C.C.R. § 1103-1.1.  Defendants address their Motion to Decertify only to Plaintiffs' claims under the FLSA.  Doc. 68 at n.1.

Plaintiffs seek damages for back and overtime wages, along with repayment for improper deductions, all applicable penalties, liquidated damages, attorney fees and costs of suit.  The class was conditionally certified on February 1, 2013, by stipulation of the parties. The plaintiff class is defined
as follows:

> All current and former hourly employees who performed landscape services and/or snow removal on behalf of All Phase within the State of Colorado on or after April 18, 2009. Plaintiffs further request that the class include all such employees who All Phase hires while this action is pending. Plaintiffs believe the putative class includes approximately 450 employees.

Order on Conditional Class Certification.  Doc.36 at 3.

Plaintiffs' counsel sent Notices to potential class members pursuant to the Court's conditional certification Order. The opt-in period closed on July 12, 2013, one hundred and twenty-three (123) days after Plaintiffs' counsel mailed the Notices.  As of January 14, 2014, there are 31 members of the conditional class, including the three named plaintiffs.

## II.   DISCUSSION

### A.  *The conditionally certified plaintiffs are similarly situated employees of All Phase's Maintenance Division*

Defendants observe that the maintenance crews had different workers, with different schedules, who worked at different work sites under different supervisors; and therefore, since their schedules, their supervisors, their jobs, and their job sites differed, they should not be treated as being members of the same class. (Doc. 68 at 6-31). Defendants are wrong and misunderstand the basic elements of a FLSA collective action. Application of their argument leads to a nonsensical result. If Defendants' arguments

were accepted, then sales staff at a department store who sold different products in different departments under different managers at different times would not be similarly situated when adversely affected by the same improper wage and hour policies. Similarly, wait-staff who had tips improperly deducted from their wages under a restaurant policy would not be able to litigate collectively because they worked different shifts and had different customers and supervisors.

The existence of different supervisors will not necessarily mean that parties were subject to different policies and procedures. If the allegations concern a company-wide policy that was applied under all supervisors, the existence of different supervisors is no obstacle. That same logic applies to the other differences in employment that Defendants mention. It is immaterial (except as may concern damages, should Plaintiffs ultimately prevail) that Plaintiffs worked on different crews, worked on different job sites, and had different supervisors and foremen. What is imperative is that I find Plaintiffs' evidence to support a finding that the proposed class was subject to the same challenged pay policies. Where employees are subject to standardized pay policies, collective treatment is appropriate *See Whittington v. Taco Bell of Am., Inc.,* No. 10–cv–1884–KMT–MEH, 2013 WL 6022972, at *6 (D.Colo. Nov. 13, 2013)(approving certification where employees were subject to the same set of rules and regulations).

To begin, the evidence thus far established shows that all of the plaintiffs were or are employees of the Maintenance Division at All Phase. The Maintenance Division is comprised of 4 subdivisions: regular landscaping maintenance (e.g., mowing, pruning, clean up); irrigation (e.g., sprinkler installation and maintenance);

4

enhancements (e.g., refurbishing or small building jobs for walls or the planting of gardens); and snow removal during the winter months.

No matter what division a proposed class plaintiff worked in, all were subject to the same policies and procedures outlined below.[2]

### i. "Windshield" time policy

Until at least April 2012 (and Plaintiffs argue that the evidence shows that the same policy, in fact, existed beyond that date), Defendants had a policy commonly referred to as the "Windshield" time policy. Ex. 6a, Tinberg Depo. Under that policy maintenance employees were required to report to the All Phase facility in the morning where they were subject to All Phase's written employment policy called "Travel Time On Maintenance Projects." It read as follows:

> Employees are required to meet at the shop prior to the beginning of the work shift. Travel time will be paid only on the return trip to the shop. Employees driving Company vehicles will be paid for both directions of the trip.

Ex. 1, p. 16. Once at the shop, at least until April 2012, the workers helped to load work equipment onto their truck at the facility before leaving for the first job site. *See* Ex. D., Maldonado Depo. 40:5-19. This labor began their work day. 29 C.F.R. 785.6 (2013)(" By statutory definition the term "employ" includes (section 3(g)) "to suffer

---

[2] While Defendants' motion addresses FLSA claims only, the facts that the proposed class allegedly suffered deductions for the "windshield policy" and for lunches not taken, and that they worked through what should have been rest breaks, all go to show what part of their time after their check in and until their departure time was compensable work time, and not time that should be otherwise reduced for FLSA computational purposes. These facts affect their FLSA overtime and FLSA minimum wage claims

5

or permit to work."). After approximately half an hour, the laborers would carpool to the job sites. *See* Ex. 6, Tinberg Depo. (discussing carpool procedures).

In 2011, soon after he started working at All Phase, Mr. Lozoya complained to his foreman that he was not getting paid for all his time worked. Ex. 2, Lozoya Depo. 38:13-16; 43:9-44:4. Mr. Lozoya testified that the difference in time each week reflects the deduction from laborer's pay for "Windshield" time, *id.*, 47:3-22, and meal breaks. *Id.*, 36:20-37:22; 54:9-21. In 2011, Mr. Lozoya filed a complaint with the Colorado Department of Labor and Employment ("CDLE") alleging that he was not compensated for the "Windshield" time and for working through meal times that were automatically deducted when not taken. In response to his complaint, the Department wrote to Defendants' attorney that "[T]here does seem to be a recurrent issue with not crediting employees with about 30 minutes at the initiation of their work day." Ex 3 at p. 1, Department of Labor letter dated March 29, 2012 to Ausmus Law Firm, counsel for All Phase.

Like Mr. Lozoya, Mr. Martinez, an irrigation technician, similarly testified that he was not paid for off-the-clock work performed at the All Phase yard before leaving for the first job, and upon his return at the end of the work day. Ex. 4, R. Martinez Depo. 64:12-23; 65:16-66:3. Because of his testimony and also because of that of Robert Graham, Ex. 19, R. Graham Depo., I refuse to accept Defendants' invitation to exclude irrigation technicians from the proposed class. Furthermore, because there are factual disputes regarding how and if the Windshield time policy was still in effect

6

after the official policy change in 2012, the potential class is not limited to pre-2012 hourly Maintenance employees.

ii.    Meal breaks

Proposed class members testified that crews would take a lunch break at a job site only half the time. Ex. 2, Lozoya Depo. 36:10-37:22; Ex. 3, Maldonado Depo. 31:7-21. Mr. Ruiz testified that when he was foreman he asked his supervisor if when he and his crew did not each lunch could he write down on a piece of paper 'no lunch'? He was told he could, but he still would not get paid for it. Ex. 12, L. Santacruz Ruiz depo. 27:13-24. Mr. Fisher testified that there was a one half hour difference on the top of employee time cards from the bottom of the time cards that accounted for a meal break presumptively taken. He did not, however, examine the time cards to determine if employees were paid when meal breaks were not taken. Ex. 13, Fisher Depo. 96:12-98:10).

Additionally, all employees were subject to the employee handbook that, after April 2012, was amended to include a facially illegal section on lunch breaks. The policy read: "A half hour meal break for Maintenance Employee's needs to be recorded on the time card, is un-paid and must be taken if the shift is **6** hours or more." (Ex. 1, unnumbered second page)(emphasis added). Colorado wage and hour law explicitly states that "Employees shall be entitled to an uninterrupted and "duty free" meal period of at least a thirty minute duration when the scheduled work shift

exceeds **five** consecutive hours of work." 7 CCR 1103-1, § 7, Colorado Minimum Wage Orders 28-30 (emphasis added).

### iii.   Rest breaks

Proposed class members have testified that testified their crews did not get rest breaks.  Ex. 14, J. Ramirez Depo. 65:23-66-9; Ex. 12, L. Santacruz Ruiz depo. 105:1-10.

### iv.   Time card policies

Many time cards reveal a difference of at least one-half hour to one hour less between the time the laborers reported in for work at All Phase and the total time recorded for pay on the individual jobs.  Ex. 13, Fisher Depo. 98:13-100:23; Ex. 6, Tinberg Depo. 88:15-89:17.  Mr. Blanchard testified that one hour time difference on the timecard indicating that laborers were not paid for "Windshield" time and a half hour taken out for lunch. Ex. 7, R. Blanchard Depo. 53:24, 25-54:1-55:15.

### *B. The available defenses are not meaningfully individualized*

"The second factor inquires as to whether there exist "defenses that need to be litigated on an individual basis." *Kaiser*, 2010 WL 5114729 at *7.  Defendants argue that they will present individualized defenses for 1) the accuracy of timesheets; 2) receipt of payment for some or all travel time; 3) the actual taking of a proper unpaid lunch break; and, 4) never working off-the-clock to pay disciplinary

deductions for equipment damage. All of these defenses are factual defenses, however, not different classes of legal defensive arguments. Factual defenses in an FLSA collective action will necessarily be individualized any time employees worked different schedules. For purposes of determining FLSA class propriety, standardized pay policies present standardized defenses. *Whittington*, 2013 WL 6022972 at *3.

### C. *Procedural and fairness considerations*

Last, procedural and fairness considerations also weigh in favor of collective treatment. The FLSA's collective action has an important remedial purpose: "(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D.Pa.2000) (citing *Hoffmann–La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)). Here, Plaintiffs, especially those employed for only a short time by All Phase, may not have enough incentive in terms of damage prospects to litigate individually and the cost of litigation regardless of prospects may be an entry barrier for individuals unable to pay litigation costs on their own. This action will determine in one efficient proceeding whether Defendants are responsible for executing the aforementioned illegal policies, and there does not appear to be any unfairness that would result to Defendants from litigating the challenged policies in collective fashion.

*D. Conflict of interest concern*

Defendants' most colorable argument for decertification is the suggestion that there may be a potential conflict of interest among class members because three members of the potential class are foremen who may be partially responsible for or may have helped to facilitate the accrual of damages in this case. Doc. 68 at 40-42. I agree with Defendants as a matter of law that potential class conflict of interest is a reason to deny certification. I disagree with Defendants, however, that the facts of this case present a potential conflict of interest severe enough to warrant decertification.

For example, Defendants' Motion, citing Maldonado Depo., Ex. D, 118:10-13, states, "Mr. Maldonado testified that Mr. Robles-Rivera told him about lunch breaks and said either take lunch or get docked for it." Doc. 68 at 41. Defendants statement oversimplifies what Mr. Maldonado actually said and makes it sound as though Mr. Robles-Rivera would be the one docking pay from Mr. Maldonado regardless of whether he took lunch. The transcript for the relevant piece of testimony reads:

> Q: Okay. And you said before that somebody said you're going to either take lunch or you get docked for it anyway?
>
> A: Humberto Robles said this to us, yes.

Maldonado Depo., Ex. D, 118:10-13. Defendants make a similar claim regarding testimony of Luis Santacruz , stating that "[Mr. Santacruz] testified that Humberto Robles-Rivera told him that he would not receive payment for lunch, even if he did not take a lunch break. Doc. 68 at 41. These assertions are of debatable relevance, however,

because no where is it alleged that Mr. Robles-Riveria was the one "docking" the pay or that he would have the power to ensure Mr. Maldonado got paid for lunch. There is no reason to believe that Mr. Robles-Rivera was doing anything other than stating a fact for which others were responsible.

Taking another example, Defendants' Motion, citing Maldonado Depo., Ex. D, 51:3-5, states, "In addition to Mr. Robles-Rivera, Mr. Maldonado testified that Mr. Santacruz and Mr. Lozoya instructed him to not report time on his time sheet." Defendants' characterization of Mr. Maldonado's testimony is again simplistic. What Mr. Lozoya and Mr. Santacruz told Mr. Maldonado is essentially that his pay was predetermined by their daily logs. Maldonado Depo., Ex. D, 51:20-25; 52:1-10. Further, the idea that Mr. Santacruz and Mr. Lozoya "instructed [Mr. Maldonado] not to report time on his time sheet" is at odds with Mr. Maldonado's testimony that he "never filled out any timesheets" and that Mr. Lozoya never told him to fill out a timesheet inaccurately. Maldonado Depo., Ex. D, 51:15-19.

Defendants cite *Donaldson v. Microsoft Corp.,* 205 F.R.D.558, 568 (W.D. Wash. 2001) for the proposition that courts deny certification where the interests of putative class members potentially conflict and describe the case as "failing to find adequacy when current or former managers existed in a proposed class with non-supervisors." Doc. 68 at 24. *Donaldson* is easily distinguishable. The district court in *Donaldson* did not deny certification simply because current and former managers existed in a proposed class with non-supervisors. The putative class in *Donaldson* alleged gender and race discrimination and consisted of all female and all African American non-executive

11

employees. *Donaldson*, 205 F.R.D. at 561. That is, a class member could be female or African American or female and African-American. Further, a class member could be a manager or not a manager.

Plaintiffs' allegations stemmed primarily from their dissatisfaction with the rating system that Microsoft used to determine employees' compensation and eligibility for promotions. *Id.* at 562. Specifically, plaintiffs alleged that "Microsoft uses an excessively subjective evaluation system." *Id.* Managers rated employees and performed the evaluations. *Id.* At the time of the class certification, there were more than 1,100 first-level female managers performing reviews who reviewed at least one woman. *Id.* This was almost half of all first-level managers company-wide. *Id.* Moreover, there were approximately 24 African American managers during that same period who were called upon to evaluate African American employees. Because plaintiffs' allegations about disparate treatment and disparate impact arose directly from the rating system, the court could not imagine a class that would include both those who implemented the ratings system and those who allegedly suffered under it. *Id.* at 568.

There are at least two crucial differences between *Donaldson* and the facts at hand. First, the allegations in *Donaldson* were that the ratings system was discriminatory because it was too subjective and its subjectivity allowed managers to discriminate. *Id.* at 562. Plaintiffs produced anecdotal evidence of incidents that appeared to show that managers were motivated by race or gender-based animus. *Id.* at 563. There were no allegations that upper management in any way encouraged, forced, or otherwise influenced the potential class manager members to be discriminatory. The allegations

12

and evidence in the instant action are not about foremen subjectively deciding when or when not to record time or about foremen doing anything wrong on their own initiative. Rather, the allegations and evidence support the existence of a company-wide, top-down policy of illegally subtracting pay that foremen felt obliged to follow out of a "fear" of "repercussions." *See* Maldonado Depo., Ex. D, 131:25-35; 132:1-5 There are no allegations that the potential class member foremen had any meaningful discretion to stray from the alleged company policy. Therefore, even though I concede that some of the testimony Defendants cite does appear to show potential class plaintiff foremen as engaged in questionable timekeeping, *see, e.g.* Maldonado Depo., Ex. D, 78:4-22 (Mr. Maldonado observing Mr. Robles-Riveria using white-out to underreport time), the testimony does not point to the same sort of personal culpability in the potential class plaintiff foremen as that presented by the *Donaldson* potential class plaintiff managers.

Second, unlike the situation presented in *Donaldson* where *almost half* of the class was potentially in conflict, only three potential plaintiffs out of 31 are potentially in conflict with the proposed class. *Fulton v. TLC Lawn Care, Inc.,* No. 10–2645–KHV, 2012 WL 1788140, at *5 (D.Kan. May 17, 2012), a district case from within our circuit, is far more analogous. The class in *Fulton* alleged that defendant, a landscaping company, improperly rounded away time from its hours worked by deducting paying for a lunch hour it never took. *Id.* at *3. Although one of the 14 plaintiffs had duties that overlapped only in one respect with the other plaintiffs and otherwise performed different types of work from the others, they were all paid hourly and all had the same complaint

13

about "round[ing] away." *Id.* at *2. The court found that collective treatment was proper. *Id.* at *3.

Because the evidence does not show the proposed plaintiffs to be necessarily in conflict with each other in the first instance and because any potential conflict that may later materialize appears to be minimal, I will not decertify the proposed class based on a potential conflict of interest.

### III.   CONCLUSION

For the foregoing reasons, I DENY Defendants' Motion to Decertify, Doc. 68, and certify the conditional class.

DATED:   January 21, 2014            BY THE COURT:

                                     *s/John L. Kane*
                                     John L. Kane, U.S. Senior District Judge